2012-5138 ROMAN CORPORATION v. United States 2011-5138 May it please the court, the key issue in this case involves the fact that the government did not have a reasonable basis for partially canceling the RFP to eliminate four contract line items. Moreover, even if it did, when after the cancellation it decided to obtain these very services, it acted wrongfully by issuing a new solicitation rather than reinstating the RFP and awarding the four line items there under the law. Just out of curiosity, why is it that you are bothered by the new solicitation? The old one, was it closed at the time? I don't understand closed, Your Honor. 2011. I guess I'm starting to figure out why couldn't you just file under the new solicitation and decline? We did, but new competitors were allowed into that. That's what I was wondering. At the time, the old solicitation was canceled. If we reinstate the old solicitation, doesn't it remain open longer? It wasn't closed at the time it was taken offline, so couldn't new people just file under the old solicitation? No, it was closed in that sense, Your Honor. Closed is not a term of art. No new offerors could participate in the old solicitation, nor could... The reason was a narrowing of the competitors. Right. There were 14 helicopters left for award under the quote-unquote old solicitation. When they reopened it, new competitors came in, old competitors changed their pricing and what have you. Eventually, we had the classic late bid situation here by doing this. Mr. Saltzman, help me on this, and you're going to have to work with me, too. What's the situation if an agency puts a solicitation out, it gets some bids, it's really unhappy with either the number or the quality of the bids it's gotten on the solicitation, so it says, you know what? Let's throw our net back in the water again. It says, we're going to terminate this solicitation. We are going to re-solicit the rest of it. The law in GAO has, for many years, said, if the proposal does not meet the government's needs, of course the government can cancel it. The question of whether it met the government's needs would be, I assume, that the agency would say, we really don't think these data... Yes, they came in, they offered us A, we really decided now we really need B. Their choices at that point are either to amend the solicitation and allow new offerors to come in, your honor, or to cancel and start over. So why isn't that effectively what happened here with respect to the four helicopters? Well, they canceled them, but for allegedly not having funds when in fact they had funds. Okay, well that's your first argument, but this really goes to the second question, whether what they should have done is just simply go back to the first solicitation. Why wasn't it permitted? GAO says that when you do that, you violate the integrity of the competitive system. Again, going back to my hypothetical or informational question, why does what I was asking about differ from what happened here? Because you have a very fundamentally different situation. You're not saying in your hypothetical that, oh, the terms of our original solicitation were perfectly fine, we're now going to award to a new group. What you're saying is, I need to change the terms of the solicitation to bring in new people. That's fundamentally different. That's a fundamentally different contract. What we have here is they came out for a new solicitation with the same old requirement. There was no need to bring in late offerors. In your hypothetical, there was a need because the original solicitation did not meet the government's needs. Well, the original solicitation or the original set of bids? I think it's two sides of the same coin. Maybe I'm, again, needing some help on the nomenclature here, but what you're saying is there's something different between my hypothetical in which the agency was unhappy with the responses to the initial solicitation and they chose to re-bid. On new terms. Well, or even the same terms if they were hoping that they'd get more expressions of interest or perhaps... No, I think that if it were on the same terms, we'd have the same argument, Your Honor. Okay, so that's the difference between my original... They can't come in and say, oh, we only got three bids. If we cancel it, put it back out, on the same exact basis, we'll get four bids. They cannot do that. They can't? No. Okay. That would be allowing a late bid to come in. I see. Okay. The government position... But they don't have to award the contract either, right? Oh, that's correct, Your Honor. They can decide the three bids that we got are just... That's fine and make an award. No award. And then there'll be no purchase. Six years later, they decide to put a contract out that looks a lot like the solicitation, that looks a lot like the original one to see now that they still need the helicopters, they put out another one. Then there's a question about how similar really is that new solicitation. But yes, the similarity and also the length of time. Let's assume they cancel the solicitation in year one, and six years later they put out the same solicitation. I think the argument goes away. I think I see where you are. Now, the government has argued that it has a non-pretextual reason that it canceled the solicitation in the first instance, which is budgetary uncertainty. Yes. That's how I would characterize it, right? That's correct, Your Honor. And then later, based on no additional information, except for the fact that they have decided, you know what, we really can afford this. I mean, let's think about it. You go to the supermarket. Hmm, can I afford that or not? No, I better pass on it for now because I just don't know if at the end of the month I'm going to have enough money. In hindsight, I don't want to not be able to buy milk later. And then as the year progresses, you know what, we do have enough money for this. You know, the budgeted stuff, we can do this. Why isn't that a legitimate enough reason? That may be fine, Your Honor. That's not what happened here? Well, in some sense it's what happened here. But even under that hypothetical, I would say, Your Honor, they knew all along that this uncertainty doesn't really rise to the level of a reasonable basis for cancellation. But that aside, Your Honor. But wait, who has the burden of proof here? Well, the plaintiff does. Okay, so you have to prove that this cancellation was improper. And they're asserting a non-protectual basis that you just said, well, that may be true. But, Your Honor, they – If it is true, does that end the inquiry? No, it doesn't, Your Honor. First of all, they say, quote in their brief, the appellant has never stated that it couldn't have found the money. So it had the money all along, even though it is arguing – Well, keep in mind, I could have found the money, too, when I went to the grocery store. Okay. But it was a matter of priorities. It's a matter of do I want to spend this money now? I've got the money in my pocket, but do I want to spend it now or do I want to wait and see how the rest of the fiscal year works out? I mean, look, we're all living under sequestration looming large over our heads right now. I realize this is not a contract in place today. But it sort of reinforces a financial aspect in my mind of what maybe they were going through at the time regarding being cautious with their budget. Your Honor, but the case law goes on to say that in that instance where they now say, oh, lo and behold, we have the money to fund those four contract line items, that they cannot go out on the street for a new solicitation for the same exact requirement. They are required in order to maintain – Wait, where does it say they're required? Because my understanding of the case law, I think the cases you're talking about – I don't have them handy here – but my recollection is that where they say they made a mistake in canceling. No, it doesn't go that – it's not that limited, Your Honor. I thought that each of those cases that you cited, that I don't think happens. Remind me of which case and tell me which one doesn't have an admission by the government of a mistake in canceling. Alternative health reconsideration does not. Alternative health reconsideration. Basically, in that case, it's a confederation of offerors which have the opportunity to submit a proposal. Is there GAO? Yes, this Court has not addressed this issue directly. But even in the GAO cases, so there was no admission there by the government? No, they had argued in that case that they had done it properly, but the GAO had disagreed with them. And the GAO imposed the late bid rule. And we cite also to Bill Bright Contractors and Paper Manufacturing in our brief. I wish there were a case law on this in the circuit, but it hasn't arrived yet. We will have it after this case, I trust. Besides Bill Bright, what was the other case? Baker Manufacturing. Oh, yeah, okay. The government... Don't go away without talking about your trade-off analysis. I'm sorry, Your Honor? Don't go away without talking about your trade-off analysis. Oh, I will, Your Honor. The government says, though, that notwithstanding all of this, it doesn't matter because Croman was not in the zone of consideration for award of those four items. And as we point out in our papers, that the record shows that Croman had a better combination of technical merit and low price than any of the 14 other helicopters to which award of these things could have been made. And we go through piece by piece at note 16 on page 17 of our brief. And I won't repeat that here. But the record shows that but for the agency's cancellation of the forked lens, Croman would have had a very substantial chance of being awarded at least one, and perhaps as many as three, of those line items. Now, I had to look at my notes to confirm that. I had the understanding that the three GAO cases you cited were cases in which it was the predicate or the GAO's conclusion was that there was an improper cancellation of the original solicitation. Is that right? I believe in each of those cases it occurred, but I don't think that it was... If we were to say that the cancellation here was not improper in the first instance, then those cases wouldn't control. Oh, they would control, Your Honor. I think that the fact that there was an improper cancellation is not critical to whether or not there was a late bid. If the agency somehow had made a proper determination, and we don't agree that it is, to cancel and then came out the next day and reissued a new solicitation, we would make the same argument that this is nothing more than an opportunity to allow late bids in. And I believe that each of those cases would apply in that instance, Your Honor. Again, the rules on late bid, which this Court has adopted, are very, very stringent. You don't allow late bids in because it violates the integrity of the system. By the way, in a matter of alternative health, which I have on my screen right now, just a one-page decision, it says, quote, the Bureau does not dispute our conclusion that cancellation was improper. So I think technically, factually, you're wrong. At least on that GAO case, it will take me longer to go pull up... I believe one of the other cases that I made was mistaken. But in that one, it says it expressly. Is that reconsideration or the original? Matter of alternative health. But reconsideration or the original case? I believe that's the reconsideration, Your Honor. Reconsideration, yes, it is. Judge Wallen, you wanted me to, and I realize I'm going into my time, but you wanted me to address the failure of the government to perform a tradeoff. I want you to address your argument. And that's very significant. The government here, in its source selection plan, and I'll quote, Your Honor, said a tradeoff analysis will be made first by determining the best value for each item. That's A20015 of the record. Unless we cut right to the core of your argument, which seems to be that they just did it mechanically. They did it mechanically, Your Honor. They put it into the computer. The computer spewed out numbers and recommendations based on the evaluation. They said it. No human looked at it thereafter. Here's my problem, Your Honor. The numbers that go into the input to the computer come from human beings. They do. There's a whole bunch of schemes that are created to come up with these evaluations. That's right. Isn't that human input? That is human input. But here's the human input that was missing. You come up with these numbers, and the cases are legion, that numbers alone do not support a selection decision. And we've cited some of them in our briefing. Okay. You have a group of people sitting around, right? And they score a product. Are you saying that when they do those scores that that's not sufficient? That's sufficient for that purpose, Your Honor. But then in a best value analysis in the RFP that they talked about, it says the critical factor in making a price technical tradeoff, and I'm reading from the RFP, is not the spread between the technical scores, which were put together by human beings, but the significance of the difference. The computer can't judge the significance of the difference. No human being judged the significance of the difference. What is necessary in a tradeoff analysis is for a human being to say, I have a high-priced offeror who has a very good technical score, and it probably has a high price. Is it worth spending the taxpayer's money to award to this higher scored, higher priced offeror, or can I get the best value by selecting someone who can, where the technical difference really is not all that substantial, but we can save an awful lot of money. That's the decision that the source-selected official is supposed to make on a line-item by line-item basis that he did not make in this instance. He got his results from the computer, said they were massive, showed me which way to go, and he followed it. Okay, Mr. Saltzman, we'd better hear from the government. I'll defer two minutes of your rebuttal time. Thank you, Your Honor. Mr. Austin. Get me out of here, Mr. Austin. Isn't it odd? What Mr. Saltzman is saying is that there's no human input when you get to the point of having plugged information from these teams into the computer. Is there any further human input at that point? There's extensive human input after that point. As Your Honor pointed out in your questioning of counsel, there's extensive input before, but going directly to your question about after, yes. As soon as the data came out of the computer, it was reviewed by three different entities, by the contracting officer, the TET, and the SSA, and that's documented in our record. The SSA certification is at page 020734 of the record, and the TET review is documented at 020535 of the appendix, and in addition to that, as you would expect, the contracting officer reviews the data that comes up to the computer to make sure it complies with the terms of the solicitation. So, yes, it's absolutely true there's human input. I also want to talk about the human input that goes in in the initial stage because it's extensive. I have an impression. There's four different criteria that go into the calculation of the 65% that counts for the technical. Two of those are subjective evaluations where the TET sits down and actually looks at the evaluation, both for past performance and for organizational experience. So it's all human input there. In addition to that, Your Honor probably recalled that there was a corrective action here. Under the first corrective action, the TET actually took the computer data and made a change. It didn't answer the second. It made a change because one of the offerors had offered four helicopters, and all four received CLINs, and he decided for that particular vendor that it made more sense to simply have three CLINs awarded to him and save the fourth CLIN to have this helicopter assigned so he could replace the other three, so it changed the winner for that CLIN. In Croman's brief, Croman says in two different places, in two different footnotes, that there was no tradeoff analysis between price and technical factors or the adjectival factor. They say it even more bluntly in another place in their brief. They say there simply was no tradeoff analysis. Your Honors, nothing could be further from the truth in this case, and I want to demonstrate that to the Court so that the Court understands that, and if the Court will allow me, I'd like to turn to Attachment 7 to the award recommendation, which appears at page 020731 of the Joint Appendix, A20731. But Your Honor, if you'll permit me, it's difficult to read, and I've prepared a blow-up of that. If we could bring that up to the Court simply for that date, would that be okay? All right, sure. This attachment is extraordinarily significant, and that's why I want to take the time to go over and review exactly what it contains so that we can take some knowledge as to how it works to understand the detail of the information that's in here. Is this all confidential? Yes. Okay. But it is in the appendix. It's page 020731. I'm just providing a quote with a copy. If you look at the upper left-hand corner and the data that appears there, you can see the weighting that was done in this chart. The lower rating is if there was 100 percent weight given to total low price per pound, which is noticeably different. A minute ago in your argument, you referred to the percentages, and you said them out loud, and I thought they were confidential, and so I pinged my clerk, and that's why I'm – so whatever you say I'll assume is not confidential that we can talk about? We can talk about it, but it is confidential information. Okay. The courtroom is not closed, and these all go on. You do realize that these records are going to go on the website. I understand. Okay. So whatever you say in this courtroom is not confidential. I understand. Okay. Go ahead. The weighting that was done here was 100 percent for total loss price per pound. That's the lowest data. There was another weighting for 100 percent load of total cost, another one for 100 percent total low adjectival, and the last one was a weighted OM with 65, 35 percent. And if you look at the top of the page at the title of this, it says tradeoff analysis comparing OM assignments for line items 16 through 34 between weighted solution and three single objective optimum. To say that there's no tradeoff, and this is exactly the purpose of what they did, is completely incorrect. Now let's look at how this works, and what this means in English. I'm not in the shape to say there was human input because somebody missed all the weight. If we look at the CLIN that they raised in their brief, it's CLIN 17. So I'll draw your attention to that, which is the second CLIN. That's under line item. You'll see all those 17s. And you'll see total low price per pound, and you'll see central copters, What that means is that if 100 percent weight was given to total low price per pound, central copters would have won CLIN 17. If you look at the next line, it's total low total cost, timberline helicopters would have won. And that's under an optimum where 100 percent weight is given to cost, zero to the others, timberline would have won. The next one is total low adjectival. That's where 100 percent weight is given to the technical factors, the adjectival factor, and Columbia helicopters would have won. And finally, the top line, which is the weighted OM, with the 6535, they have yet another helicopter, Firehawk helicopters. You can see that the weighting, the 6535, is dispositive of who wins each CLIN. And that demonstrates the tradeoff analysis. To the extent there's any doubt in your honor's mind, the upper right-hand corner is particularly instructive. And I'm talking about the top line, which is line items 16 through 34. And remember, this deals with the, not the heavy helicopters, but the middleweight ones, which are at subject here. And remember, each helicopter can only serve one CLIN. So that if one helicopter has the best ratings for five different CLINs, part of this optimization model is to assure that that helicopter lands in the CLIN, which will give the best value to the government. So the information in that upper right-hand corner is extremely instructive. We don't need to go to the total low PPP line, but if we just look at the total low total cost line, that would be $121 million. And what that figure means is that if 100 percent weighting is given to cost, they would, everything else, it would cost the government $121 million to procure these helicopters. But look at the adjectival rating, which would be 2.4969. Now, if we just ignore cost completely and went to total low adjectival, giving that 100 percent weight, it would cost the government $165 million. Now, this is very helpful, and you've done a good job of explaining the form. I don't want to derail you, because if you really want to spend more time on this, I'm going to let you, but I really would like to ask you a couple of questions on the other issue, which is the cancellation and reinstatement. And is this a convenient time, or do you want to spend a few more minutes on that? I can spend a couple more minutes, and I'll certainly talk about that. But, and you can see that the adjectival is 2.2873 for low adjectival. The weighted OM, on the other hand, is $135 million. So the government there is trading off $14 million, if you compare it to total low cost, for an adjectival that's 2.29, compared to 2.28. So they gave a .01 adjectival in an ideal situation, yet saved $30 million from what total adjectival would have cost them. That is what the optimization model did. It was a trade-off analysis, and it did it perfectly. I'm going to briefly touch on that issue of prejudice, and then I was going to turn it. I'll issue a prejudice. The Court's observation why there was no prejudice is really a very common sense one. You have to compare yourself to the other competitors. Croman didn't do it below. They didn't do it in their open brief to this Court. They tried to do it in their reply brief, but they made an erroneous statement, which tried to attack our analysis, and I'll explain in a moment why that's erroneous. But it's common sense why you have to compare yourself to other offerors. Let me just give one hypothetical to illustrate this. Let's assume for Clint-17 there were 100 offerors, and for whatever reason the winner, Clint-242, was eliminated. You now have 99 offerors there, one of which is Croman. And let's assume in this hypothetical that 98, the other 98, all had lower costs and all had lower adjectivals to Croman. Croman would claim, well, we were still prejudiced. Well, no, they didn't have a substantial chance of prevailing because all 98 would have beaten them. So what's important here, and what the trial court emphasized, is that you have to have that analysis done, and they didn't do it below, and they didn't even do it in their opening brief in this case, where, again, they just compared themselves to the winner, and that's inadequate, and therefore it's clear there's no prejudice. The one point I wanted to make in the reply brief, we gave a hypothetical where we demonstrated two helicopters that we felt, from an analysis, would get it. If the winner, a Firehawk winner, had not gotten Clint-17, if total cost was emphasized, it would have been a Swanton. If adjectival was emphasized, as 6535 indicated, it would have been another Firehawk. They come back and say, well, those helicopters were eliminated from the competition. That's not true. There's nothing in the record that indicates they were eliminated from the competition. In fact, if you turn in the record to attachment one to the award recommendation, which is located at page A20511, you can see those helicopters listed there. All they say to you for this principle is the footnote in our brief below, where we said, as I mentioned earlier, that during the correction, for one particular vendor, the court decided, I'm sorry, the Forest Service decided to eliminate the one helicopter because the other three were being used. You can see on A20511, the number, if you look at the first part, there are all the winning vendors with helicopters, and on the second part, you can see that there's no losers, the people who didn't get a claim are listed below. If you're only listed above and you're not listed below, that means that all of your helicopters were used in a claim, and therefore, their statement is wrong that they were eliminated. Finally, I want to turn, Your Honor, to the issue of the cancellation. This is really, in my view, a very simple question. The government absolutely has the right to cancel part of a solicitation as long as it doesn't do so in an arbitrary and capricious manner. Here, the trial court made a factual finding that the government's reason for doing so was rational, that reason being budget constraints. Okay, let's assume that you're right about that, and then go to the second argument that Mr. Saltzman makes, that having done that, having canceled, you had an obligation to go back to the original solicitation. That is, first of all, there's absolutely no support in the law for that at all. There's not one case in the court of federal claims. There's nothing the other way either. There's nothing that says the government is permitted to put forth one solicitation, mistakenly cancel it, and then go forward with a new one. Well, first of all, Your Honor, this is not a case of mistake. No, it is a mistake. At the time, you thought you might not have the money for it, and later you realized you did. You had an ultimately mistaken impression. Well, but the cases, and I think Your Honor was referring to the GAO cases, talk about mistake but honest mistake. That's the actual language that those GAOs use. Are you saying this particular one was dishonest? No, it wasn't. Well, it's different because it's subsequent events that change things. At the time that the government made the decision, they had a budget constraint, and the reason was this was in October, and they had a continuing resolution that only gave them money until November, so they didn't know what the future was going to hold. In December, there was a bill passed that gave them the money, but the fact that the money became available in December doesn't mean that what they thought back in October was wrong. Well, why not go back? Sorry, go ahead. Go ahead. And also, the cases that they cited GAO are distinguishable for three basic reasons. Why not go back to the original solicitation? Why? Well, there's two questions there. One is, well, first of all, it was impractical to do so because the offers that had been made from the original solicitation had expired. Those companies were no longer obligated to have those helicopters, and in fact, many of those helicopters were gone. They've been obligated elsewhere. It was seven months, Your Honor, from the time of the cancellation in October of 2011 until May when they did it. It would have been practically impossible to do so. Second of all, Croman actually picked up an advantage because those helicopters that were no longer available, they didn't have to compete with them. They argued, well, people had more information from the original. Well, they had the same additional advantage, the information. What is the extent to which the government is free, upon having a solicitation to which there are bids, and the government concludes that it really doesn't like the array of bids that it's gotten, to what extent is it free to simply say, cancel that solicitation, let's re-bid this contract? Well, Your Honor, that question, which is also one of the reasons these GAO cases are distinguishable, depends in large part whether it's a FAR 14 case or a FAR 15 case. A FAR 14 case is a sealed bid. As opposed to a negotiated bid. Right. If it's a negotiated bid, presumably you have much more liberty to act on something like that. But if it's a sealed bid, and this was negotiated. But if it's sealed, you can't come back and say, okay, you had the lowest bid, but we're not happy with your low bid. We're going to just re-bid the whole thing. What the FAR says in that circumstance, Your Honor, which is the Madison Services case of the quota federal claim, which quotes it, is that in that circumstance you have to have compelling reason to cancel it. Okay. And that's because those sealed bids are open. Everything's out in the open. Everybody sees it. That's not the case in the Nacotian. The standard is very different. You have to have a rational reason. There was a rational reason here. They haven't shown clear error. All right. And unless there's any other questions, I would ask the Court to affirm the decision below. Thank you. Mr. Saltman? Thank you. A couple of points, Your Honor. In a sealed bid situation, the test is compelling reason rather than a reasonable basis because all of the data has been put out in the public. With regard to the question of whether it was impossible to reinstate, first of all, it was not seven months. It was more like three months after the decision to cancel was made known. It would not have been impossible to reinstate. All they had to do, as in these other examples in the GAO cases where they reinstated, is to go back to the offerors and say, are you willing to reinstate your bid and extend your bid opening time? It is done every single day of the week. So the idea that it was impossible is a frivolous argument. The government alludes to the fact that we were not prejudiced and points to the fact that in our assessment on page 17 of our brief, we improperly indicate that the agency excluded two competitive helicopters. I cannot point at this moment to the page in the record, but I will if Your Honors would like. The fact of the matter is the agency decided that for companies that they wanted to have one helicopter in reserve for in case there were some problems and that they would not award to a company if it didn't have a spare helicopter back at the home office. And so these two helicopters were in fact excluded from the competition. So for us to say we didn't have to compete against them is a true statement. Mr. Solomon, I wouldn't be using my time for this. The government has said that you made a misrepresentation in this court, and I would be addressing that. I am, Your Honor. We did not make a misrepresentation. The fact is that these two helicopters were excluded, and I will provide... No, I'm talking about the spreadsheet that the government provided to us that says that there was indeed human input. Your Honor, if you will, I will absolutely address that. There is no human input in this Attachment 7. If Your Honor looks at it, what we have here is a set of... and I'll use the exact language that the government used in its brief. Attachment 7 is merely a display of various optional sets of awards. That is, if we chose to award... Are you representing to this court that the contracting officer did not go back in and review this application? He reviewed it, Your Honor. What he did is he looked at the data that came out... The contracting officer is a human being. Your Honor, if I might. The data came out of the computer, largely in this form. He and other people reviewed it for accuracy. They looked at these. Is this number properly calculated? Is this the number we input? They did that, Your Honor. What they did not do, and what a best value calculation requires, and Your Honor will not see it anywhere on this sheet, is does making an award to Company A, who had the highest technical evaluation, if it justified under... Let's put it a bit differently. Is the difference in price in Company A's high technical approach worth the increased cost of that line item? So what you're saying is that there was human review, not the exercise of human judgment. Exactly, Your Honor. There was... I have no doubt, Your Honor, that there was substantial human review. There was not that judgment call that is required in a best value calculation. Your Honor, the RFP... Your time is up, and we have to call it to a vote. We thank our counsel for their argument. Your Honor, if I might. Would the court want that citation to the record to which I alluded? No. Thank you. All rise. The Honorable Court is now adjourned from day to day. Thank you. I'm not happy to see you, sir. No. Largely a memory of you. Yeah.